OPINION OF THE COURT
Howard E. Levitt, J.
Motion and cross motions for summary judgment are disposed of as hereinafter set forth.
*62 Plaintiffs, owners of a condominium residence at The Greens of North Hills, located in North Hills, New York, seek to invalidate as allegedly usurious, a mortgage note and mortgage in the principal amount of $80,000 and bearing interest at the rate of 10%% per annum, which was executed in favor of defendant Long Island Savings Bank to secure a mortgage loan made in connection with said purchase. Plaintiffs initially sought class action status in order to represent other similarly situated borrowers. The-class action motion was denied by this court on June 17, 1981 because a statutory penalty was sought for alleged usury (Carter v Frito-Lay,, 74 AD2d 550). However, the defendant’s cross motion for permission to add other similarly situated parties as “additional parties on counterclaim” was granted.
The Long Island Savings Bank, the defendant herein, a savings bank duly organized under the laws of the State of New York, cross-moves for summary judgment, dismissing the complaint of the plaintiffs, and the cross claims of certain of the additional parties in this action which seek to invalidate, as allegedly usurious, 38 mortgage loans made by the bank to them as purchasers of the subject condominiums.
The predicate for the plaintiffs’ action, joined in by the cross motions for summary judgment of certain of the additional parties, is the since repealed subdivision 10 of section 14-a of the Banking Law, a statute which allowed the permissible mortgage rate in New York to rise periodically from the then long-standing 8%% limit to a maximum rate prescribed by the New York State Banking Board. That statute, however, limited to 81/2% the maximum interest rate charged upon mortgage loans for which either a “commitment” was issued and “executory” prior to December 8, 1978, or for which a “completed application” was submitted within the preceding 120-day period.
The statute provides in relevant part: “[T]he rate of interest so charged, taken or received on any loan or forbearance secured primarily by an interest in real property improved by a one-to-six family residence which is to be occupied by the owner * * * with respect to which a written commitment shall have been issued and is execu *63 tory prior to December eighth, nineteen hundred seventy-eight, shall be deemed to be the rate specified in the letter of commitment but in no event shall such rate exceed eight and one-half per centum per annum * * * and on any such loan or forbearance for which a completed application was submitted not more than one hundred twenty days prior to December eighth, nineteen hundred seventy-eight shall be deemed to be the prevailing rate of interest fixed by law at the time the application was submitted regardless of whether a commitment at a higher rate of interest was issued, but in no event shall such rate exceed eight and one-half per centum per annum”. (L 1979, ch 7, § 1; emphasis added.)
This statute was repealed by section 2 of chapter 883 of the Laws of 1980. Thus, because of its extremely short life, the courts of New York have not until now been required to construe it with reference to expired commitments obtained prior to December 8, 1978 or to applications filed within 120 days before that date.
For the following reasons the court grants summary judgment to the defendant dismissing the plaintiffs’ complaints and denies plaintiffs’ motions accordingly.
The plaintiffs and the 37 sets of mortgagors joined by the bank’s supplemental summons and amended answer, are purchasers of condominium residences at The Greens, for whom mortgage loans were made by the bank. As to each of the affected mortgagors, initial commitment agreements were either issued and executory prior to December 8, 1978, or a completed application had been filed within a 120-day period prior to that date. As to all of the mortgagors, however, whose initial commitments were for terms of approximately one year (tied to the estimated date of closing of title) each of these commitments expired before the loans were consummated because of construction delays which plagued the sponsor-developer of The Greens. Concededly, the bank had no responsibility for the delays. Consequently, as the uncontroverted documentary evidence submitted upon this motion discloses, the mortgage loans of the plaintiffs and of the additional mortgagors joined as defendants, were consummated pursuant to various types of extension agreements or completely new com *64 mitment agreements between the bank and the borrowers, at rates between 10 and 11%, the maximum legal rate in force in New York at the time of each loan closing.
Contending that the bank was legally proscribed from closing the mortgage loans at rates in excess of 8V2% per year, notwithstanding the expiration of the commitments, the plaintiffs and the additional mortgagors argue that the mortgage transactions are usurious under former subdivision 10 of section 14-a of the Banking Law entitling them to the imposition of the draconian penalties found in section 5-511 of the General Obligations Law which (in the case of a savings bank such as the defendant herein) require a forfeiture of all interest payable during the 30-year mortgage loan term, plus a penalty equal to twice the interest already paid under the mortgage loan, a forfeiture herein of an aggregate of approximately nine million in interest over the term of the mortgages, plus a further penalty of approximately $600,000.
Relying solely on a strict reading of the statute (Banking Law, § 14-a, former subd 10), which was enacted shortly after the original commitments herein, the plaintiffs and the additional parties contend that, notwithstanding the expiration of their mortgage loan commitments caused by an inability to timely close, they enjoyed an “indefinite” and “indefeasible” right to mortgage loans at an interest rate of 8.5%. They urge that a perpetual, noncancelable right to mortgage loans at an interest rate of 8.5% was created that survived the expiration of their commitments. They argue that because they originally obtained commitments prior to December 8, 1978 or applied for commitments within 120 days prior to that date, the bank was forever bound to fund their mortgage loans at that rate.
The intent of the Legislature is the primary object sought in the interpretation of statutes (Rankin v Shanker, 23 NY2d 111), and whenever such intention is apparent it must be followed in construing the statute (Matter of River Brand Rice Mills v LaTrobe Brewing Co., 305 NY 36) in order to promote the spirit, purpose and objects to be accomplished (Matter of Martinez v Ficano, 28 AD2d 215).
Let us look at the legislative intendment of the statute. An extraordinary session of the New York State Senate *65 was called on December 7, 1978. In a message of necessity to the Senate, the Governor recommended that the Banking Law be amended to prescribe a gradual increase in the allowable rates of interest charged by lending institutions on residential mortgage loans in order to improve the availability of mortgage money (transcript of Senate debate, Dec. 7, 1978, p 1). At that time the prime rate was approximately 20% while the maximum mortgage rate was 8.5%. Families wishing to purchase homes were summarily rejected by lending institutions which literally could not afford to extend mortgage loans at the current rate. In fact, most mortgage lenders were driven out of the residential market altogether, resulting in a virtual drought of mortgage funds.
In response to the Governor’s message, a series of amendments to the Banking Law were adopted permitting the allowable mortgage interest rate to rise periodically in increments of up to XA% to a maximum rate to be prescribed by the New York State Banking Board, tied to the prevailing rate of Treasury bills.
The purpose of section 14-a of the Banking Law was to allow banks to charge higher interest rates on residential mortgage loans and thus enable them to extend such loans without suffering financial loss and abrogating their responsibility to their depositors.
Of course the banks in New York State were well aware of this pending legislation and consequently many of them deferred the approval of mortgage loan applications or adjourned closings in contemplation of legislative approval of a higher rate of interest. In order to avoid injustice to prospective homeowners, former subdivision 10 of section 14-a of the Banking Law provided, inter alia, that the rate of interest on a residential mortgage loan with respect to which (1) a commitment was issued and executory prior to December 8, 1978, or (2) a completed application was submitted not more than 120 days prior to December 8, 1978, could not exceed the then maximum allowable rate of 8.5% per annum. It was through this provision that the Legislature sought to gradually raise mortgage interest rates while at the same time avoiding the inequities *66 caused when delaying tactics were employed (Senate debates of Dec. 7, 1978, p 35).
Under the statute, as originally passed, the purchaser of real property could avail himself of the lower of either the interest rate at the time a completed application was submitted or the rate at the time of closing. The minimum length of time for the application was 120 days. Thus, if the 120 days was designated as the limit, when that period covered by the application expired, the prevailing rate would be the rate at closing. If, however, during the time between the application and closing a written commitment was issued and was executory prior to December 8, 1978, the prevailing interest rate could not exceed 8xh% notwithstanding any rate specified in the letter of commitment.
In order to forestall the banks from letting the original application lapse without issuing a commitment or waiting until after December 8, 1978 to issue commitments, the statute was amended to provide that if the completed application was submitted within the 120 days prior to December 8, 1978, it would survive to hold the then prevailing rate until a commitment was issued either before or after December 8,1978, the statutory cutoff date (Senate debates of Dec. 7, 1978, p 35).
Plaintiffs contend that this section of the statute must be strictly construed. Reasoning that because it does not establish any period during which the 8xfa% maximum rate shall be effective (although the Legislature had every opportunity to have imposed a specific limitation), plaintiffs claim that “it is clear that the state rushed to protect, indefinitely, those persons who had arranged for financing just prior to the increase in rates.”
The court agrees that there must be a strict reading of the statute, but by interpreting the absence of a limitation period to mean that a boundless time period — unrestricted — applies, the plaintiffs’ conclusion is patently wrong. One cannot ignore the remedial purpose of the statute, to wit: to improve the availability of mortgage money by raising mortgage interest rates and the amendment, to wit: to prevent stalling by the banks. It was never the intention of the Legislature to segregate out a select *67 group to reward them with a perpetual right to an 8.5% mortgage loan. Rather, in carrying out its avowed purpose, the Legislature desired to cure the inequities caused by banks which had used delaying tactics as a result of being mandated to guarantee to those who fell within the narrow group defined in the statute the 8.5% rate of interest, for either 120 days or the original term of their commitments.
When the borrowers were unable (not because of stalling tactics by the bank) to close prior to the commitment expiration dates, the bank, pursuant to former subdivision 10 of section 14-a of the Banking Law was freed of the 8.5% interest ceiling. It extended the loans at the highest legal rate of interest then prevailing. The plaintiffs were duly advised of this increase by “amended commitment” letter. Each borrower acknowledged the increase in interest by indorsement but some added the words “under protest.” The court notes that the bank could very well have chosen not to make the loans at all.
A typical scenario began with the signing of a purchase agreement for a condominium unit of The Greens in the middle of 1978. The agreement provided that construction would be completed no later than October 31, 1979. In addition, the contract stated that it was conditioned upon issuance to the purchaser of a commitment by the Long Island Savings Bank at specific terms.
Application was then made to the defendant bank for a mortgage loan sometime in September, 1978. A commitment was issued within a four-week period thereafter. Each commitment letter contained an expiration date, and an acknowledgment by the purchaser of the receipt of and agreement to the commitment.
Construction of the units did not proceed as anticipated and the expiration dates were approaching. Letters were then written to the bank asking for extension of commitments, “in the event that [the purchaser] is unable to close due to the delays”.
In some cases where the commitment had expired, the bank sent a letter advising the buyer that the commitment expired and “in the event you desire a new commitment we will consider a new application for the same principal *68 amount at the prevailing interest rate. If you elect to apply for a new commitment please complete the enclosed application and return it to the bank.” This letter, however, was then followed by a letter of clarification that it was not the intention of the bank to refuse to fund the loans and that the interest rate of the mortgage would be the rate established by the New York State Banking Board at the time of closing the loan. So long as there had been no adverse change in employment or financial status an extension of the original commitment would be issued without the formal requirement of a new application form.
In a few cases, as a result of the purchaser’s initial correspondence, an “amended commitment” was sent out with the added provision that the “interest rate will be the highest rate permitted by the New York State Banking Board as of the date of closing.” These “amended commitments” had to be “agreed, approved and accepted” as well.
Finally, in some cases, the bank actually advised the purchasers that it considered its commitment “null and void and of no further effect” but nevertheless subsequently issued an “amended commitment” at the prevailing interest rate as of the date of closing.
The bank acted immediately to accommodate these purchasers and issued commitments as well as the amended commitments without any delay, in order to forestall the purchasers being faced with a call from the builder to take title and then find that no financing is available.
Plaintiffs point out that whether or not there was a “commitment,” an “extension” or an “amended commitment,” an application had been submitted within the 120 days prior to December 8, 1978 and this satisfied the statutory requirement to freeze the rate. They indicate further that “none of the plaintiffs were asked to file new applications for commitments” upon the expiration of their original commitments, a statement belied by the undisputed fact that many if not all were contacted by the bank as to the necessity of filing new applications i/there was a change in financial circumstances.
To require the bank to demand that a new application be filed each time the borrower asked for additional time would have been wasted action on behalf of both bank and *69 borrower. It already had the requisite information and in the absence of any substantial change in financial circumstances form cannot have been required to be exalted over substance.
Furthermore, the mere fact that an original application was filed does not freeze the rate of interest “indefinitely.” The purpose of filing the application was to obtain a commitment. Once the original commitment was issued, the original application form ceased to have any significant import. It initially held the rate of interest at the 8.5% level for the life of the commitment whenever it was issued by the bank. Once, however, the commitment expired, through no fault of the bank, so also did the underlying statutory effect of the application. The prior application forms, in the absence of any change in financial circumstances of any of the said purchasers, were deemed to be new applications for purposes of issuing the new or amended commitments.
This view is supported by opinions promulgated by the Banking Department of the State of New York. Specifically, in an opinion dated October 8, 1981, it stated that “neither the legislative history nor past Department opinions would permit an interpretation of Section 14-a (10) (2) to provide for the freezing of any mortgage interest rate commitment for IV2 years * * * The bank was under no legal obligation to request a new application before issuing the new commitment. In fact, the bank was under no obligation to issue the new commitment.”
It is well settled that the interpretation given to a statute by the governmental agency most familiar with the intricacies of its industry and charged with effectuating it, is entitled to be given great weight (Matter of Harbolic v Berger, 43 NY2d 102; Matter of Howard v Wyman, 28 NY2d 434; cf. Matter of Saur v Director of Creedmore Psychiatric Center, 41 NY2d 1023; Matter of Rubin v Levine, 41 NY2d 1024). Moreover, “such interpretation is entitled, where the meaning of the statute is doubtful, to great, if not controlling, weight.” (Matter of Armitage v Board of Educ., 122 Misc 586, 590, affd 210 App Div 812, affd 240 NY 548.)
*70 Clearly, then, there was no violation of former subdivision 10 of section 14-a of the Banking Law. Moreover, the court also finds that there was never a violation of section 5-501 of the General Obligations Law warranting any sanctions under section 5-511 of the General Obligations Law. Section 5-511 of the General Obligations Law states in relevant part that “the knowingly taking, receiving, reserving or charging * * * a greater sum * * * by a savings bank * * * shall only be held and adjudged a forfeiture of the entire interest which the loan or obligation carries with it or which has been agreed to be paid thereon. If a greater sum * * * has been paid, the person paying the same * * * may recover from the savings bank * * * twice the entire amount of the interest thus paid.”
The penalty is clearly stated. However, it is based upon the “knowingly taking” of the sums involved. Under the circumstances presented, the defendant bank did not have the requisite intent to exact a usurious interest rate. Our courts have held that “an innocent mistake of fact in estimating the amount of interest, would not constitute usury, because there must be an intention, a corrupt agreement to take more than the law allows, to make out what we understand by usury.” (Bank of Salina v Alvord, 31 NY 473, 475.)
At the time former subdivision 10 of section 14-a of the Banking Law was extant, there had been no judicial interpretation of the statute’s application. The defendant bank could only rely upon the Banking Department for guidance. The position of that department was noted earlier. There has been no showing of bad faith upon the part of the bank and no manifestation of any intent to exact an unlawful rate of interest on the subject mortgages (Koibong Li v Astoria Fed. Sav. & Loan Assn., 81 AD2d 857).
Defendant is, accordingly, granted summary judgment. The cross motions of the additional named parties are denied.